Gerald C. **BOLTON**, Appellant,

v.

David W. **HARRIS**, Acting Superintend-
ent of Saint Elizabeths Hospital,
Appellee.

No. 21032.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 29, 1967.

Decided Feb. 16, 1968.

As Amended May 6, 1968.

Petition for Rehearing En Banc
Denied July 12, 1968.

**644**

William H. Dempsey, Jr., Washington, D. C., (appointed by this court) for appellant.

Thomas Lumbard, Asst. U. S. Atty., with whom David G. Bress, U. S. Atty., Frank Q. Nebeker and Judith Ann Wilson, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and EDGERTON, Senior Circuit Judge, and ROBINSON, Circuit Judge.

BAZELON, Chief Judge:

In this appeal from denial of habeas corpus, appellant attacks the mandatory commitment provisions of D.C.Code § 24–301(d) [hereinafter Subsection (d)] [1] and the release provisions of D.C.Code § 24–301(e) [2]. These pro-

1. If any person tried * * * for an offense * * * is acquitted solely on the ground that he was insane at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill. [D.C.Code § 24–301(d) (1967)].

2. Unconditional release, under Subsection (e), requires the superintendent of the

visions apply after a successful voluntary plea of not guilty by reason of insanity. The primary contention is that these provisions violate equal protection because they do not afford safeguards available for those civilly committed under the Hospitalization of the Mentally Ill Act of 1964.[3]

Gerald C. Bolton was charged with unauthorized use of a motor vehicle[4] and transportation of a stolen motor vehicle[5] in June 1965. At trial in August 1966 defense counsel stipulated to the facts concerning the alleged offense and relied solely on a plea of insanity. The only witness at the trial was Dr. George Weichardt, a psychiatrist on the staff of Saint Elizabeths Hospital. He gave this interesting account of appellant's early history.

> Mr. Bolton was originally admitted to St. Elizabeths Hospital at the age of approximately 16 years—that was in 1949. The hospital records show that his mother complained that he refused to bathe, that he preferred to stay in the house all the time, that he wanted all the window shades pulled down, and that he became so unruly at home that she took him to D. C. General Hospital and from there he was transferred to St. Elizabeths. He remained on the rolls of St. Elizabeths Hospital up until 1957.
>
> I might say that during that time it came out that Mr. Bolton had a peculiar fascination with automobiles and that on several occasions he left the hospital without permission.
>
> In 1951 he left the hospital without permission and it was said when he returned that he had been involved in difficulty with an automobile.
>
> In 1952 he left the hospital again without permission and took an automobile to Georgia and then to New York. He was hospitalized then at Bellvue [sic] Hospital in New York City, and later at the Pilgrim State Hospital in New York state.
>
> He eventually returned to the hospital. He made several more visits away from the hospital without permission.
>
> Finally in 1957 he eloped from the hospital and at that time the record shows that he was arrested in Florida for theft of an automobile. Since he was civilly committed to the hospital the hospital had no way to get him back and he was discharged from the hospital while he was on this elopement status.

Dr. Weichardt stated that appellant was suffering from mental illness at the time of the stipulated offenses in 1965 and that these offenses were a product of this illness.

He also testified that after the offenses in 1965 and before trial in 1966, Bolton was treated for five months at the Rockland State Hospital in Orangeburg, New York. But he was not asked and did not say that the hospital reported that appellant "responded to chemo and psychotherapy, and general milieu treatment," and was discharged *"Condition: Recovered* [emphasis added]."[6] And it

mental hospital to certify "(1) that such person has recovered his sanity, (2) *that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself, or others,* and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital * * *." D.C.Code § 24–301(e) (1967) (emphasis added). To establish eligibility for release on habeas corpus, the patient must prove "freedom from such abnormal mental condition as would make the individual dangerous to himself or the community in the reasonably foreseeable

future." Overholser v. Leach, 103 U.S. App.D.C. 289, 292, 257 F.2d 667, 670 (1958), cert. denied 359 U.S. 1013, 79 S. Ct. 1152, 3 L.Ed.2d 1038 (1959).

3. D.C.Code §§ 21–501 to 21–591 (1967). The equal protection guaranty applies to the federal government through the fifth amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

4. D.C.Code § 22–2204 (1967).

5. 18 U.S.C. § 2312 (1964).

6. At the habeas hearing appellant testified that he had a letter that "says I was

further appears that eight months after his release from the New York Hospital the Superintendent of Saint Elizabeths reported that Bolton was "suffering from mental illness * * * but is competent for trial." At the conclusion of trial and with the apparent consent of the Government, Bolton was found not guilty by reason of insanity and committed to Saint Elizabeths Hospital pursuant to Subsection (d).

Three months later he brought this habeas corpus action alleging *inter alia* that shortly after the stipulated offenses he was committed in July 1965 to the Rockland State Hospital where he was treated "for six months and released as cured" of the mental illness which led him to commit the criminal acts. At a habeas corpus hearing held December 12, 1966, Dr. Weichardt, who was respondent's only witness, testified that appellant was still mentally ill and that if released "he'd get in trouble taking

automobiles again." Bolton now appeals from the district court's denial of relief.

## I

Before acquittal or conviction, a defendant's mental condition is relevant to two issues. One is competence to stand trial—*i. e.*, whether he is able to "understand the proceedings against him or properly to assist in his own defense."[7] For this purpose, the inquiry is focused on *present* mental condition, namely, at the time of trial. The other is criminal responsibility—*i. e.*, whether the act charged, if committed, was the product of mental disease or defect.[8] For this purpose, the inquiry is focused on *past* mental condition, namely, at the time of the offense. Even though a defendant may not be suffering from an abnormal mental condition at the time of trial, his mental condition at the time of the offense may require his acquittal by reason of insanity.[9]

discharged as well from the State Hospital in New York City," and that "I tried to introduce this letter at my trial and my lawyer wouldn't let me. * * *" Whereupon his counsel said:

Your Honor, I have a letter addressed to Mr. Bolton signed by the Director of the Rockland State Hospital dated November 16, 1966. I would like to present this to the Court if there is no objection.

THE COURT: You have to offer it in evidence. You can't just present it. Although we find no letter dated November 16 in the file and records, our attention has been called to an undated letter which Bolton apparently received shortly before the December 12 habeas hearing. That letter reads in full as follows:

Dear Mr. Bolton:

I have received your letter dated November 30, 1966 and addressed to Dr. Sher of this Staff.

According to our records, you were admitted to Rockland July 14, 1965 and discharged to the custody of the U.S. Marshall [sic] of the Southern District of New York, New York City on December 3, 1965.

It appears, however, that at the habeas hearing Bolton was referring to another letter from that Hospital, one dated April 1, 1966 which reported "condition: Recovered." This letter was attached to a pretrial "Motion for Psychiatric Exami-

nation" and was also mentioned in appellant's unsuccessful "Motion for Issuance of Subpoena" for a psychiatrist at the New York Hospital. Yet neither at trial nor at the habeas hearing nor in the appellate briefs was the letter of April 1 mentioned by the court, Government or defense counsel. When we called attention to this letter at oral argument appellant's counsel (who was not his counsel below) stated that he did not see the letter until after the briefs were filed, but that in any event the letter did not affect appellant's contentions. Government counsel claimed no knowledge of the letter prior to argument. Given our disposition of this case we need not decide whether the letter required the court sua sponte or the Government to order another psychiatric examination at trial, *cf.* United States v. Sharp, 381 F.2d 708 (4th Cir. 1967), or an independent psychiatric examination at the habeas hearing, *cf.* Bresnahan v. Cameron, No. 20,162, (D. C. Cir. December 8, 1966).

7.  D.C.Code § 24–301(a) (1967).

8.  Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954).

9.  See Lyles v. United States, 103 U.S.App. D.C. 22, 26–27, 254 F.2d 725, 729–730 (1957), cert. denied 356 U.S. 961, 78 S. Ct. 997, 2 L.Ed.2d 1067 (1958).

■ In Cameron v. Mullen,[10] we held that upon an acquittal by reason of insanity over a defendant's objection, a third inquiry is required for commitment, one that embodies the procedural safeguards of civil commitment. This inquiry, like the one on competence to stand trial, concerns *present* mental condition, but its purpose is to determine whether the defendant is mentally ill, dangerous and in need of treatment.[11] A defendant who was insane for the purpose of responsibility at the time of the offense may not be insane for the purpose of civil commitment at the time of the verdict, or (although competent to stand trial) he may be insane, dangerous and in need of treatment for the purpose of civil commitment.[12]

Because the plea of insanity was imposed upon the defendant in Cameron v. Mullen, she was committed to Saint Elizabeths under D.C.Code § 24–301(a) [hereinafter Subsection (a)]. By its terms that subsection applies *"prior* to the imposition of sentence," [emphasis added] and only for commitment of those found of "unsound mind" or "mentally incompetent to stand trial." [13] But it has been employed after an unsought insanity acquittal, ever since the Supreme Court held in Lynch v. Overholser,[14] that Subsection (d)'s provision for automatic commitment was not available after such acquittal.

■ In a habeas corpus petition, Mrs. Mullen challenged the validity of her confinement under Subsection (a). After the district court found that subsection unavailable, we held that she was entitled to have the more protective provisions of the 1964 Hospitalization of the Mentally Ill Act. We relied upon our decision in Cameron v. Fisher[15] in which we had held Subsection (a) unavailable by its own terms. We also relied on the principle derived from the Supreme Court's decision in Baxstrom v. Herold,[16] that the commission of criminal acts does not give rise to a presumption of dangerousness which, standing alone, justifies substantial difference in commitment procedures and confinement conditions for the mentally ill. We concluded that "while prior criminal conduct is relevant to the determination whether a person is mentally ill and dangerous, it cannot justify denial of procedural safeguards for that determination." [17] And we also concluded that "while prior criminal conduct is a relevant consideration for determining the conditions of custodial care, it does not provide an automatic basis for allowing significant and arbitrary differences in such conditions." [18] We think the principles of *Baxstrom* also apply where, as here, the defendant is acquitted upon his own plea of insanity.

---

10. 128 U.S.App.D.C. 235, 387 F.2d 193 (March 2, 1967).

11. The standard for civil commitment is whether "the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty * * *." D.C.Code § 21–545(b) (1967).

12. See Winn v. United States, 106 U.S.App.D.C. 133, 135, 270 F.2d 326, 328 (1959); Lyles v. United States, *supra* note 9; Durham v. United States, *supra* note 8. See also Blunt v. United States, 100 U.S.App.D.C. 266, 244 F.2d 355 (1957).

13. Subsection (a) commitment, according to the cases, required a hearing for de-

termination of present mental illness for those acquitted by reason of insanity over their objection. See, *e. g.*, Lynch v. Overholser, 369 U.S. 705, 712, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). However, the section provides that the hearing must be "without a jury." See Cameron v. Mullen, *supra* note 10, 387 F.2d p. 200.

14. *Supra* note 13.

15. 116 U.S.App.D.C. 9, 320 F.2d 730, 731 (1963).

16. 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

17. Cameron v. Mullen, *supra* note 10, 387 F.2d p. 201.

18. *Id.*, 387 F.2d p. 201.

## II

Subsection (d) provides for automatic commitment without any hearing, even though acquittal by reason of insanity reflects only a reasonable doubt that the defendant was sane at the time of the offense.[19] Like commitment under Subsection (a), the period of confinement under Subsection (d) is indeterminate and is unrelated to the period for which sentence could have been imposed upon conviction.[20] A patient confined under Subsection (d) may be released only upon order of the court. The order must be based upon either the certificate of the Superintendent of Saint Elizabeths Hospital[21] or the patient's petition for habeas corpus.[22] The Superintendent may certify either that the patient has recovered his sanity, that he will not be dangerous to himself or others in the foreseeable future, and that he is entitled to unconditional release; or that, while not fully recovered, he is eligible for conditional release. In either case, the court may release the patient on the certificate or it may hold an evidentiary hearing concerning his recovery. It has been held that for release on habeas, the patient must prove beyond a reasonable doubt that he is free "from such abnormal mental condition as would make the individual dangerous to himself or others in the foreseeable future."[23] and, according to some cases, that the Superintendent's refusal to issue a certificate is arbitrary and capricious.[24]

So construed, this statutory scheme would conceivably allow a patient committed under Subsection (d) to remain in the hospital for the rest of his life without a judicial determination that he is mentally ill or that he is still likely to commit dangerous acts. In sharp contrast the 1964 Hospitalization of the Mentally Ill Act, enacted subsequent to the decisions referred to above, requires a judicial determination and places the burden of proving insanity on the Government.[25] It also requires the hospital to examine a civilly committed patient at least every six months and to release him without a court order if the chief of the patient's service then deems him recovered.[26]

■ The present version of § 24–301 prescribing the summary commitment procedures of Subsections (a) and (d) and the release standards of Subsection (e) was enacted after our decision in Durham v. United States.[27] Its purpose was to "achieve a balance of interest between the public and the person charged with the crime"[28] by insuring that

19. See Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 312–313, 281 F.2d 943, 947–948 (1960).

20. Overholser v. Lynch, 109 U.S.App.D.C. 404, 410, 288 F.2d 388, 394 (1961), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). Appellant, however, has not yet been confined in the hospital for a period longer than the maximum sentence which could have been imposed for the offenses charged.

21. D.C.Code § 24–301(e) (1967).

22. D.C.Code § 24–301(g) (1967).

23. Ragsdale v. Overholser, supra note 19, 108 U.S.App.D.C. at 312, 281 F.2d at 947 (1960); Overholser v. Leach, supra note 2, 103 U.S.App.D.C. at 292, 257 F.2d at 670.

24. Compare Overholser v. Leach, supra note 2 at 291, 257 F.2d at 669, and Ragsdale v. Overholser, supra note 19, 108 U.

S.App.D.C. at 311, 281 F.2d at 946, with Overholser v. O'Beirne, 112 U.S.App.D.C. 267, 269, 302 F.2d 852, 854 (1961).

25. See D.C.Code §§ 21–541 to 21–545 (1967).

26. D.C.Code § 21–548 (1967). At six month intervals, the patient may also request examination by "one or more" physicians, including an independent practitioner. The chief of service may automatically release him on the strength of the examination. If he refuses, and one of the examining physicians disagrees, the patient may seek a court order of release. D.C.Code §§ 21–546, 21–547 (1967). For other differences between commitment under D.C.Code § 24–301 and civil commitment, see Cameron v. Mullen, supra note 10, 387 F.2d p. 200.

27. Supra note 8.

28. S.Rep.No. 1170, H.R.Rep.No. 892, 84th Cong., 1st Sess. 2, 3, 16.

"in every case where a person had committed a crime as a result of mental disease or defect, such person *shall* be given a period of hospitalization to guard against imminent recurrence of some criminal act by that person." [29] The congressional committees which proposed the legislation thought "a mandatory commitment statute would add much to the public's peace of mind and to the public safety, without impairing the rights of the accused." [30]

Before the advent of *Baxstrom* and the new civil commitment safeguards of the 1964 Hospitalization of the Mentally Ill Act, we said it was reasonable to treat those found not guilty by reason of insanity differently from other mentally ill persons because of the greater likelihood that the former will be dangerous to society,[31] and that habeas corpus provided a sufficient safeguard for their rights.[32] But in view of *Baxstrom* and the 1964 Act prior criminal conduct cannot be deemed a sufficient justification for substantial differences in the procedures and re-

quirements for commitment, and habeas corpus may no longer be deemed to afford adequate protection against unwarranted detention.[33] These principles apply whether a plea of insanity is raised by defendant, prosecutor or court. In each case the defense may be based merely upon "some" evidence, said to be "more than a scintilla" but not necessarily enough to raise a reasonable doubt of sanity.[34] The plea is neither an express nor implied admission of present illness, and acquittal rests only on a reasonable doubt of *past* sanity, *i. e.*, at the time of the offense. It follows that there is no reasonable basis for distinction for commitment purposes between those who plead insanity and those who have the defense thrust upon them.[35] Neither may be automatically deprived of the type of protection which the 1964 Hospitalization of the Mentally Ill Act provides.

Our view of the effect of *Baxstrom* and the 1964 Act upon the validity of mandatory commitment was confirmed by the New York Court of Appeals in.

29. *Id.* at 1 (emphasis in original).

30. *Ibid.*

31. In Overholser v. Leach, *supra* note 2, 103 U.S.App.D.C. at 291–292, 257 F.2d at 669–70, we said that persons acquitted because of mental illness constitute an "exceptional class" for whom commitment procedures may be more summary and release provisions more stringent than those applied to persons "with similar mental conditions who have not committed criminal offenses or obtained verdicts of not guilty by reason of insanity at criminal trials." Immediate commitment has been justified to protect the public from "the commission of new criminal acts," Ragsdale v. Overholser, *supra* note 19, 108 U.S.App.D.C. at 313, 281 F. 2d at 948, and to allow "trained medical experts had a reasonable opportunity to observe and examine the subject and report their findings" so as to determine "whether he has recovered and whether he will be dangerous if released." *Id.* at 313, 314, 281 F.2d at 948, 949. See also Overholser v. O'Beirne, *supra* note 24.

32. Ragsdale v. Overholser, *supra* note 19, 108 U.S.App.D.C. at 313, 281 F.2d at 948.

33. See Cameron v. Mullen, *supra* note 10, 387 F.2d 201.

34. Tatum v. United States, 88 U.S.App. D.C. 386, 190 F.2d 612 (1951); McDonald v. United States, 114 U.S.App.D.C. 120, 122–123, 312 F.2d 847, 849–850 (1962). See also Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

35. It has been suggested that Congress might have established the presumption of continuing insanity for those who successfully pleaded insanity in order to guard against false pleas. See Lynch v. Overholser, *supra* note 13, 369 U.S. at 715, 82 S.Ct. 1063. But rights are not ordinarily denied to all because of the fear that a few might abuse them. See Tussman & tenBroek, The Equal Protection of the Laws, 37 CALIF.L.REV. 341, 351–52 (1949).

People v. Lally,[36] where the court considered New York's mandatory commitment statute.[37] That statute, like D.C. Code § 24–301, did not provide for a hearing prior to commitment and did not provide for a jury trial when the patient sought release. It authorized automatic commitment to a special hospital for the dangerously insane (Matteawan) where restrictions on patients were far greater than in civil mental hospitals.[38] The New York court expressly recognized the similarity of its statute to our Subsections (d) and (e), and relied upon our decision in Ragsdale v. Overholser[39] to support the validity of § 454. It *said* the statute did not offend constitutional principles of equal protection, but it *held* that in order "to provide defendant with protection equal to that of other persons under the New York State statutes as to adjudications of mental incompetency," defendant is entitled to a jury hearing when he seeks his release under § 454(5).[40] Furthermore, the court held that in order "to comply with the spirit if not express language * * * of *Baxstrom*," defendant is entitled to the same procedures for commitment to the special hospital for the dangerously insane that apply to all others civilly committed.[41]

*Baxstrom, Lally* and *Mullen* render Subsection (d) constitutionally suspect because the subsection provides radically different procedures for patients acquitted by reason of insanity and for civilly committed patients. The more recent case of Specht v. Patterson[42] renders Subsection (d) constitutionally suspect simply because the subsection fails to provide a hearing on present mental condition. In *Specht*, the Supreme Court held that a defendant convicted under Colorado law for "indecent liberties" could not be given an indeterminate sentence under the Colorado Sex Offenders Act without a full hearing. It rejected the Tenth Circuit's contention that defendant was "afforded all the rights of due process at the time of trial,"[43] by pointing out that the imposition of an indeterminate sentence requires "a new finding of fact [that the person convicted constitutes a threat of bodily harm to the public] that was not an ingredient of the offense charged [at trial]."[44]

After acquittal by reason of insanity there is also need for a new finding of fact: The trial determined only that there was a reasonable doubt as to defendant's sanity in the past, present commitment is predicated on a finding of present insanity. Thus *Specht* would appear to require that this finding be made in a hearing.[45]

The question is whether Subsection (d) can survive this constitutional attack.

**36.** 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E.2d 87 (1966).

**37.** N.Y.Code Crim.Proc. § 454 (Supp. 1967).

**38.** N.Y.Code Crim.Proc. § 454(6) (Supp. 1967). See also N.Y.Correction Law, McKinney's Consol.Laws c. 43, § 388 (1944).

**39.** *supra* note 19.

**40.** People v. Lally, *supra* note 36, 19 N.Y. 2d at 35, 277 N.Y.S.2d at 660, 224 N.E. 2d at 9.

**41.** *Ibid.* This approach was also followed by the New York Supreme Court in People ex rel. Goldfinger v. Johnston, 53 Misc. 2d 949, 280 N.Y.S.2d 304, 307 (Sup.Ct. 1967), where an inmate of a correctional school was transferred, without hearing, to a state institution for defective delinquents. The court concluded that under the Supreme Court decision in Specht

v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), it is immaterial whether the confinement is labeled "civil" or "criminal" and that *Baxstrom* at least narrows the distinction between civil and criminal commitment. Accordingly, it held that "the provision for notice and for a hearing can be read into the section as readily as was done in the fairly analogous situations which obtained in * * * Lally * * *." 280 N.Y.S.2d at 307.

**42.** *Supra* note 41.

**43.** 357 F.2d 325, 326 (1966).

**44.** 386 U.S. at 608, 87 S.Ct. at 1211.

**45.** It could be argued that there is a reasonable presumption that a person acquitted by reason of insanity is presently insane. But in *Specht*, there was a reasonable presumption that a person convicted of indecent liberties constituted

Rigid application of the equal protection doctrine might suggest that Subsection (d) be wholly supplanted by the Hospitalization of the Mentally Ill Act.[46] But a reasonable application permits Subsection (d) to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant differences between these two groups.

▇▇▇▇ We agree with Ragsdale v. Overholser,[47] for example, that commitment without a hearing is permissible for the period required to determine present mental condition. The jury's finding of a reasonable doubt as to defendant's sanity at the time of the offense provides sufficient warrant for further examination.

The length of time required for such examination will vary, of course, with the individual case. It will be the responsibility of the court to establish this period, just as it now orders the hospital to make a determination and report its

findings when the question of an accused's competency to stand trial is raised.[48] The courts in this jurisdiction have sufficient experience with the problems involved to make individual judgments.

▇▇▇▇ Once the examination period is over, however, there is no rational basis for denying a hearing. It is true that persons acquitted by reason of insanity have committed criminal acts and that this fact may tend to show they meet the requirements for commitment, namely, illness *and* dangerousness.[49] But it does not remove these requirements. Nor does it justify total abandonment of the procedures used in civil commitment proceedings to determine whether these same requirements have been satisfied. Hence persons found not guilty by reason of insanity must be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings.[50] Since nothing in Subsection (d) precludes a hearing and since *Baxstrom* and *Specht*

(in the words of the Colorado Sex Offenders Act) "a threat of bodily harm to members of the public * * *." Nevertheless, the Supreme Court required a full hearing. And the need for a hearing was not obviated by the availability of habeas corpus. *Compare* Ragsdale v. Overholser. *supra* note 19, 108 U.S.App. D.C. at 313, 281 F.2d at 948.

46. The Court of General Sessions (Halleck. J.) took this position in United States v. Arduini, Crim. No. 10748–49 (1966).

47. *Supra* note 19 at 313, 281 F.2d at 948.

48. See D.C.Code § 24–301(a) (1967).

49. See D.C.Code § 21–545(b) (1967).

50. The Government can request this hearing or the court can hold one on its own motion. Where feasible, the requirements of the Hospitalization of the Mentally Ill Act as to notice, counsel, jury trial, etc. should be followed. Reference to the Mental Health Commission is not required. Commitment will result if the court finds, by the preponderance of the evidence, that the person is "likely to injure himself or other persons" due to "mental illness." See D.C.Code § 21–545 (b) (1967).

We note that a person need not be psychotic to be civilly committable. He may be committed if he suffers from any "mental illness" which "substantially impairs [his] * * * mental health" so as to make him dangerous to himself or others. D.C.Code §§ 21–501, 21–545(b) (1967). And it is not essential that the illness fit "specifically into any of the various classes of mental illness recognized by the American Psychiatric Association." In re Alexander, Patient, 125 U.S.App.D.C. 352, 354, 372 F.2d 925, 927 (1967).

To comport with the changes in Subsection (d) procedures, the so-called *Lyles* instruction should be modified along the following lines: "If the defendant is found not guilty by reason of insanity, it then becomes the duty of the court to commit him to Saint Elizabeths Hospital for examination. After this examination a hearing will be held to determine whether defendant is dangerous to himself or others due to mental illness. If he is, defendant will remain at Saint Elizabeths until it is established that he is no longer dangerous due to mental illness, at which time he will be released and will suffer no further consequences from this offense." See Lyles v. United States, supra note 9, 103 U.S.App.D.C. at 25, 254 F.2d at 728.

require one, we deem it necessarily implicit in our statute. The New York Court of Appeals took the same view concerning the parallel New York statute.[51]

■ We recognize that although a court "will often strain to construe legislation to save it against constitutional attack, it must not and will not carry this to the point of perverting ·the purpose of a statute." [52] The purpose of Subsection (d) is not perverted by the hearing we require. Neither was there perversion of the statute in Crowell v. Benson [53] where the Supreme Court reasoned that, since Congress had not "expressly provided" otherwise, the statute should be read as affording a de novo judicial determination, of jurisdictional facts, nor in the *Japanese Immigrant Case* [54] where the Court reasoned that a hearing was required even though the statute simply authorized the Secretary of the Treasury to deport an immigrant whenever the Secretary was "satisfied that [the] immigrant [had] been allowed to land contrary to [applicable law]."

In Cameron v. Mullen, we were unable to save Subsection (a) because it would have required conferring "upon the Court of General Sessions authority to impose conditions reserved for civil commitment proceedings [as to which] Congress has given the District Court exclusive

jurisdiction * * *" and because the subsection was by its terms inapplicable to post conviction commitment.[55] These problems do not confront us here.

### III

■■ The question then arises how a person thus committed can obtain release. We uphold the release provisions of § 24–301(e) even though they differ from civil commitment procedures by authorizing court review of the hospital's decision to release a patient.[56] We do not think equal protection is offended by allowing the Government or the court the opportunity to insure that the standards for the release of civilly committed patients are faithfully applied to Subsection (d) patients.

■ We note, however, that under civil commitment procedures, a patient is entitled to periodic examinations by the hospital staff and has the right to be examined by an outside psychiatrist. If just one of the examining physicians believes he should no longer be hospitalized, he is entitled to a court hearing.[57] Subsection (e) provides none of these safeguards. Because we find no rational justification for withholding these safeguards from a Subsection (d) patient, we construe Subsection (e) to require them.[58]

51. See p. 650 *supra*.

52. Scales v. United States, 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782 (1961).

53. 285 U.S. 22, 62–63, 52 S.Ct. 285, 76 L. Ed. 598 (1932).

54. 189 U.S. 86, 94, 99, 23 S.Ct. 611, 47 L. Ed. 721 (1903).

55. *Supra* note 10, 128 U.S.App.D.C. p. 245, 387 F.2d p. 203.

56. The civil commitment release procedures are set forth in D.C.Code §§ 21–546, 21–548 (1967).

57. See D.C.Code §§ 21–546 to 21–548 (1967).

58. This court has already required independent psychiatric examinations under certain circumstances. See Watson v. Cameron, 114 U.S.App.D.C. 151, 312 F. 2d 878 (1962).

We also urge the hospitals concerned to establish other internal administrative procedures to supervise release, as well as treatment, practices. See Rouse v. Cameron, 125 U.S.App.D.C. 366, 371 n. 22, 373 F.2d 451, 456 n. 22 (1966). Such procedures would provide guidance to reviewing courts and, more important, would enable the hospitals to examine their own actions and practices in order to determine whether they should be corrected or defended. We note that the New York legislature has already instituted a system of internal administrative review. N.Y. Mental Hygiene Law, Mc-

■■ Subsection (d) patients may also establish their eligibility for release by a writ of habeas corpus.[59] This court has often debated what the burden of proof should be in such habeas proceedings.[60] But it follows from our view of the requirements of equal protection that the burden for Subsection (d) patients must be the same as that for civilly committed patients. While the criminal acts committed by a Subsection (d) patient may be evidence indicating whether or not the burden has been met, they do not justify a different burden.

■■ Unfortunately, the cases in this jurisdiction do not make clear what the burden of proof is in habeas proceedings challenging civil commitment.[61] It could be argued that the Government should have the burden of proving that the patient is still committable, since this is where the burden lies in the initial commitment proceeding.[62] But the traditional rule in habeas corpus proceedings is that the petitioner must prove, by the preponderance of the evidence, that his detention is illegal.[63] We conclude that the traditional rule should apply, particu-larly since we have previously held that the hospital must assist the court in acquiring all the relevant information on the patient's condition, treatment, etc.[64] Thus, the court must find, by the preponderance of the evidence, that the patient's commitment is no longer valid—i. e., that he is no longer "likely to injure himself or other persons" due to "mental illness."[65] To the extent that this holding modifies our prior decisions in Leach,[66] Ragsdale,[67] and O'Beirne,[68] we deem the modifications required by Baxstrom and Specht and by the 1964 Hospitalization of the Mentally Ill Act. These modifications in no way alter the rule which the public safety has always required, namely, that persons who are dangerous due to mental illness be confined.

## IV

■■■ The question remains whether our ruling today should have retroactive or only prospective effect. We think the interests both of justice and of administrative convenience are best served by applying our ruling on Subsection (d)

Kinney's Consol.Laws, c. 27, §§ 86, 88 (Supp.1967).

59. D.C.Code § 24–301(g) (1967). Before applying for a writ, patients will have to exhaust the administrative remedies we construe Subsection (e) to require. See Dobson v. Cameron, 127 U.S.App. D.C. 324, 383 F.2d 519 (Sept. 1, 1967) where we held that civilly committed patients must normally exhaust the administrative procedures provided by D.C. Code § 21–546 (1967) before applying for habeas corpus. If the hospitals prescribe further administrative remedies (see note 50 supra), the court may require their exhaustion also.

60. See, e. g., Ragsdale v. Overholser, supra note 19; Overholser v. Russell, 108 U.S.App.D.C. 400, 283 F.2d 195 (1960).

61. In Lake v. Cameron, 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966), the court held that the patient "may not be required to carry the burden of showing the availability of alternatives [to complete confinement or unconditional release]." But it did not expressly consider the burden of proof in release cases.

62. See D.C.Code § 21–541 et seq. (1967); Lynch v. Overholser, supra note 13.

63. See, e. g., Johnson v. Zerbst, 304 U.S. 458, 468–469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

64. Lake v. Cameron, supra note 61, 124 U.S.App.D.C. at 268, 364 F.2d at 661. The court made clear that "[p]roceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings." Ibid. Thus technical rules as to who has the burden of bringing relevant evidence to the attention of court do not apply.

65. D.C.Code § 21–545(b) (1967). Our handling of the burden of proof question is similar to that of the concurring opinion (Fahy, J.) in Ragsdale v. Overholser, supra note 19, 108 U.S.App.D.C. at 315, 281 F.2d at 950.

66. Supra note 2.

67. Supra note 19.

68. Supra note 24.

prospectively only [69] and by applying our ruling on Subsection (e) and Subsection (g) (habeas corpus) to all cases, including cases of persons heretofore committed under Subsection (d). Accordingly, we

reverse the judgment and remand with directions to issue the writ unless the Subsection (d) commitment procedures required by this opinion are instituted within thirty days.[70]

69. See Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ; Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) ; Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). Without deciding whether Stovall v. Denno, *supra*, 388 U.S. at 301, 87 S.Ct. 1967, requires such a course in all cases, we apply this otherwise prospective ruling to appellant himself.

70. We believe a thirty-day time limit is reasonable in this case because Saint Elizabeths has had the opportunity to observe and examine appellant for over a year and a half.