**James POWELL, Petitioner-Appellee,**

v.

**STATE OF FLORIDA,
Respondent-Appellant.**

**No. 77-2483.**

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1978.

Rehearing Denied Oct. 17, 1978.

---

**326**

Robert L. Shevin, Atty. Gen., Tallahassee, Fla., Mary Jo M. Gallay, Asst. Atty. Gen., Tampa, Fla., for respondent-appellant.

B. Robert Ohle, St. Petersburg, Fla., for petitioner-appellee.

Before BROWN, Chief Judge, THORN-BERRY and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

In this appeal from the grant of a writ of habeas corpus, the state of Florida attacks the district court's holding that the petitioner's equal protection rights were violated since he, a person acquitted of a crime by reason of insanity, was not afforded the same procedural protections before commitment to a state mental hospital that apply in other involuntary civil commitment cases. We vacate, holding that although a state must afford insanity acquitees substantially the same protections that it gives persons committed under the ordinary civil commitment statutes, it may treat insanity acquitees differently to the extent that the distinction has some relevance to a legitimate state interest. Finding the record inadequate to determine whether Florida complied with this standard in this case, we remand for further proceedings.

## I. Facts and Prior Proceedings

On November 1, 1972, James Powell was charged by information with premeditated murder. He timely filed a notice of intention to rely upon the defense of insanity at the time of the offense,[1] and after trial the jury returned a verdict of "not guilty, and not guilty by reason of insanity." Powell moved for a judgment of acquittal and for immediate release, but the trial judge by order of May 22, 1973, denied these motions. Since the only defense seriously asserted at trial was the insanity defense, the judge "determine[d] and rule[d] that the verdict returned by the jury was that of not guilty by reason of insanity therefore placing the Defendant under the provisions of Rule 3.460 Florida Rules of Criminal Procedure."[2]

---

1. At the time of Powell's trial Fla.R.Crim.P. 3.210 required a defendant intending to rely on the defense of insanity at the time of the offense to give notice to the state. Powell's defense was based on his tendency toward heavy drug usage and his intoxication on cocaine at the time of the homicide which rendered him unable to distinguish between right and wrong.

2. Fla.R.Crim.P. 3.460 provides for acquittal for cause of insanity:

  When a person tried for an offense shall be acquitted by the jury for the cause of insanity, the jury, in giving their verdict of not guilty, shall state that it was given for such cause. If the discharge or going at large of such insane person shall be considered by the court manifestly dangerous to the peace and safety of the people, the court shall order him to be committed to jail or otherwise to be cared for as an insane person *and such person shall be held in custody until released by order of the committing court,* or may give him into the care of his friends, on their giving satisfactory security for the proper care and protection of such person; otherwise he shall be discharged. (italics added) The italicized portion of this rule was added after Powell's conviction, but the Florida Supreme Court held this to be a clarification to conform to case law rather than a change in procedure. *Powell v. Genung,* 306 So.2d 113, 116 & n. 1 (Fla.1974).

Acting pursuant to Rule 3.460, the trial judge in that same order made the following determination: *

Considering the evidence adduced at trial, the plea of not guilty by reason of insanity and the verdict entered in this cause, the Court finds that the Defendant James Powell is manifestly dangerous to the peace and safety of the people and should not be allowed to go at large and an appropriate order shall issue requiring his delivery to the State Hospital for appropriate treatment.

This determination was made without a hearing and without the benefit of evidence regarding Powell's present mental condition. The order committing Powell to the Florida State Hospital, Chattahoochee, Florida, for appropriate treatment was entered on May 24, 1973, and Powell entered the hospital on June 20.

On January 22, 1975, the superintendent of the Florida State Hospital notified the trial judge that Powell's treatment "has been completed and further hospitalization is not indicated at this time. He has been found to be no longer dangerous to the safety of others." A clinical summary accompanied this letter, indicating Powell's final diagnosis to be "Psychosis with Drug Intoxication (Cocaine), in remission." The report expressed the clinical psychologist's feeling that Powell would not be dangerous, provided he remained off drugs, and it expressed the General Staff Conference's consensus that Powell was no longer dangerous and that he should be returned to the court for the final disposition of his case. The report concluded with the recommendation that Powell be actively involved in a drug rehabilitation program so that adequate supervision could be attained while he readjusted to his return to society.

In response to this letter and Powell's motion to compel release, the court called a

hearing on March 6, 1974, at which testimony was taken and arguments heard on Powell's then mental condition. Unfortunately the transcript of this hearing is not in this habeas corpus record, so we do not know who testified or about what they testified. Following this hearing, the court on March 12, 1974, entered an order denying Powell's motion to compel release. In relevant part that order states:

The recommendations of the hospital and treating physicians are based upon the assumption that this court would have continuing jurisdiction over James Powell after his discharge from hospitalization and consequently could recognize and prevent future narcotic intoxication. This assumption is incorrect.

This court finds from the evidence that the underlying psychosis remains even though the symptoms are in a state of remission. The patient remains a manifest danger to himself and others and therefore his hospitalization should be continued.

Powell next sought habeas corpus relief in the Florida Supreme Court. That court held that the trial judge's finding that Powell was still manifestly dangerous was fully supported by the evidence presented at the March 6, 1974 hearing, and finding no other error, it denied the writ. *Powell v. Genung*, 306 So.2d 113 (Fla.1974).

Turning to the federal courts, Powell filed a petition for habeas corpus in the middle district of Florida on January 15, 1975, alleging that Florida deprived him of due process of law and of equal protection in that his original commitment and the provisions for his release differed from the procedures used in civilly committing other insane persons.[3] While this petition was pending, Powell received administrative hearings on the need for his continued hospitalization.[4] Also during the pendency of

---

3. Powell amended his petition to include a claim that he was denied treatment, *see Donaldson v. O'Connor*, 493 F.2d 507 (5th Cir. 1974), *vacated and remanded*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), but this claim was abandoned since it had not previously been litigated in the state courts.

4. On March 26, 1975, Powell was given a hearing before a Florida Department of Health and Rehabilitative Services hearing examiner to determine whether he should remain hospitalized or released to the committing court. At that time Fla.Stat.Ann. § 394.467(3)(b) & (4) entitled one committed pursuant to Fla.R.Crim.P. 3.460

this petition, the state trial judge on October 4, 1976, granted a petition filed by Powell requesting convalescent leave or furlough to attend college courses in Michigan up to and including the academic term commencing in January 1977. On June 14, 1977, the federal district court, adopting the magistrate's recommendation, entered an order granting Powell's petition for writ of habeas corpus. In an accompanying opinion the court held (i) the petition was not mooted by Powell's eighteen-month furlough to attend college in Michigan; (ii) the original commitment under Fla.R.Crim.P. 3.460 violated Powell's due process rights; (iii) the March 6, 1974 hearing on Powell's motion for release cured the original due process defect; (iv) the original commitment under Fla.R.Crim.P. 3.460 violated Powell's equal protection rights; (v) the March 6, 1974 hearing did not cure the original equal protection violation since Powell still was not provided with the statutory procedures applicable to others involuntarily civilly committed; (vi) the requirement that court approval be obtained prior to the discharge of a citizen committed under Fla.R.Crim.P. 3.460 does not violate equal protection. The district court granted the writ because of the equal protection violation finding and ordered that Powell be released from custody and from all conditions sought to be imposed upon him because of his acquittal by reason of insanity. It is from that order that Florida appeals.

## II. Florida's Scheme of Involuntary Commitment

Although Powell, as an insanity acquitee, was committed to the Florida State Hospi-

tal pursuant to Fla.R.Crim.P. 3.460, all other classes of involuntarily hospitalized citizens were entitled to procedures provided by Fla.Stat.Ann. § 394.467 (1973).[5] Under § 394.467(1), the criteria for involuntary hospitalization were that a person be (i) mentally ill and (ii) likely to injure himself or others if not hospitalized. Under emergency conditions, or upon petition by a concerned citizen followed by notice and a hearing, a court could order the patient admitted to a receiving facility for evaluation, for a period not to exceed five days. § 394.463. Proceedings to determine whether the patient met the criteria for involuntary hospitalization were activated if the administrator of the receiving facility recommended, on a "hospitalization certificate," that the patient be hospitalized in a treatment facility. § 394.467(2). This recommendation had to be supported by the opinions of two physicians who had examined the patient within the preceding five days that the criteria for involuntary hospitalization were met. *Id.* The hospitalization certificate, which was required to be filed with the court, served as a petition for a hearing regarding involuntary hospitalization and authorized the receiving facility to retain the patient pending transfer to a treatment facility or completion of a hearing. *Id.* If the patient or his guardian refused to waive a hearing, a judge of the court was required to notify the administrator of the facility in which the patient was hospitalized, inform the patient and his guardian of the right to counsel (appointed if necessary), and hold the hearing, at which

to periodic hearings before a hearing examiner to determine whether continued hospitalization was necessary. Powell was represented by counsel at that hearing, and the hearing examiner considered the records in the case and the oral testimony of three psychiatrists and one psychologist. Finding that Powell was still dangerous to others as a result of a mental illness, the hearing examiner authorized continued hospitalization for one year from April 4, 1975, the date of his order.

In the summer of 1975, the trial judge authorized Powell's transfer from the Florida State Hospital at Chattahoochee to the G. Pierce Wood Memorial Hospital in Arcadia, Florida,

upon the recommendation of Powell's physicians. On May 7, 1976, another hearing was held, with Powell again represented by counsel, before a hearing examiner to review Powell's mental status and necessity for continued hospitalization. At this hearing three psychiatrists and two psychologists testified. Although the hearing examiner determined that Powell was not suffering from a mental illness and was not a danger to himself or others, the trial judge apparently refused to approve Powell's release.

5. This section has been amended since Powell's commitment. *See* Fla.Stat.Ann. § 394.467 (1978 Supp.).

one of the physicians who executed the hospitalization certificate was required to be a witness. § 394.467(3). If the judge concluded that the criteria for involuntary hospitalization were met, he was required to order the patient transferred to a treatment facility for a period not to exceed six months. *Id.* If the hospital administrator felt continued hospitalization necessary after the initial six-month period, he could commence proceedings before a hearing examiner for an order authorizing the treatment facility to retain the patient for a period not to exceed one year. § 394.469(4). At any time the administrator found the patient no longer to meet the criteria for involuntary hospitalization, he was empowered to discharge the patient. § 394.469.

Powell was initially ordered committed by the trial judge pursuant to Fla.R.Crim.P. 3.460.[6] The judge's determination that Powell was manifestly dangerous to the peace and safety of the community was not based on evidence of present mental condition adduced at a new hearing, but rather on the evidence presented at trial, Powell's plea, and the jury verdict. His initial commitment did not depend on the recommendation of the hospital superintendent, the supporting opinions of two examining physicians, and the live testimony of one examining physician, and the hospital superintendent was not allowed unilaterally to release Powell. A hearing focusing on Powell's present mental condition and dangerousness was held several months after his initial commitment, however, at which the trial judge, apparently after considering substantial medical evidence, ordered Powell to remain committed.

### III. Mootness

In light of the Supreme Court's recent remand in *Vitek v. Miller,* —— U.S. ——, 98 S.Ct. 2276, 56 L.Ed.2d 381 (1978), we first review the district court's determination that Powell's petition was not mooted by his eighteen-month furlough to attend college in Michigan. Florida argued to the district court that Powell voluntarily submitted himself to the continuing jurisdiction of the Florida state courts by virtue of his petition for convalescent leave and that due to the court's granting of that petition, Powell no longer was being restrained against his will.

In *Vitek* a prisoner's civil rights action attacking a state statute which authorized the involuntary transfer of a prisoner to a state mental hospital upon a finding by a physician or psychologist that the prisoner suffered from a mental defect for which he would be unable to receive adequate treatment in prison, the Supreme Court remanded for consideration of the question of mootness since the plaintiff had accepted parole and agreed to receive in-patient psychiatric care at a Veterans Hospital. Without deciding whether *Vitek* would apply in a habeas corpus action where the plaintiff is attacking the constitutionality of any detention rather than whether that detention should be in a prison facility or mental institution, we hold that *Vitek* does not control this case. The record contains a Florida state court order stating that but for the federal district court's order granting the writ of habeas corpus, it would revoke the convalescent leave of Powell and order his recommitment since it felt Powell currently to be a danger to society.[7] Be-

---

**6.** Since 1973 Florida statutes involving commitment following acquittal by reason of insanity have been amended to dovetail into other civil commitment statutes. *See* Fla.Stat.Ann. §§ 918.017, 394.467(3), (4) & (5), (1978 Supp.). Nevertheless, the trial judge retains the power given to him by Fla.R.Crim.P. 3.460. *In re Connors,* 332 So.2d 336 (Fla.1976). We do not review this new statutory scheme, but only what happened in Powell's case.

**7.** This order, dated June 22, 1977, followed a hearing precipitated by Powell's arrest on

March 19, 1977, on St. Petersburg Beach, Florida, for driving under the influence of alcohol. A breathalyzer test following this arrest showed *Powell's blood alcohol level to be 0.12.* A blood alcohol level of 0.10 is prima facie evidence in Florida that the person is under the influence of alcohol to the extent that his normal faculties are impaired, and a person driving a motor vehicle while he has a blood alcohol level of 0.10 or above is guilty of the offense of driving with an unlawful blood alcohol level. Fla.Stat.Ann. § 322.262(2)(c) (1975).

cause of this threat of recommitment and the continued jurisdiction of the state court over Powell in the absence of the writ of habeas corpus, we deem this appeal not to be moot.

IV.   Powell's Constitutional Claims

A.   *Due Process.* We uphold the district court's conclusion that Powell's original commitment in May and June of 1973, without a hearing to determine his present mental condition and dangerousness, violated Powell's right not to be deprived of his liberty without due process of law, but that the hearing in March 1974 on Powell's motion to compel release cured the violation for habeas corpus purposes.

■ An acquittal by reason of insanity is based upon the jury's determination that there is a reasonable doubt as to the defendant's sanity at the time of the offense. *See Farrell v. State,* 101 So.2d 130 (Fla. 1958). It does not speak to the defendant's present mental condition. *Bolton v. Harris,* 130 U.S.App.D.C. 1, 5–9, 395 F.2d 642, 646– 650 (1968). Before a trial judge can refuse to discharge a person acquitted by reason of insanity, Fla.R.Crim.P. 3.460 requires a finding that "the discharge or going at large of such insane person shall be . . dangerous to the peace and safety of the people." The section thus requires the trial judge, before he can order the defendant committed, to make a determination that the defendant is presently insane and that he now would be dangerous if discharged. *In re Connors,* 332 So.2d 336, 338 (Fla.1976). Commitment, therefore, depends upon findings of fact different from those established by the jury's acquittal by reason of insanity. Due process requires that such findings be made following a hearing at which the defendant is present with counsel, has an opportunity to be heard and to present evidence, and has an opportunity to confront

and cross examine witnesses. *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); *Bolton v. Harris,* 130 U.S.App.D.C. 1, 9, 395 F.2d 642, 650 (1968). The trial judge's commitment of Powell based only on "the evidence adduced at trial, the plea of not guilty by reason of insanity and the verdict entered in this cause" and his failure to hold a separate hearing to take evidence on Powell's then present mental condition violated Powell's due process rights.

■ The district court held that Powell is not now entitled to relief based upon this due process violation since he was afforded a hearing on his motion for release in March 1974 which met all due process requirements. No cross appeal was taken from this holding, and Powell does not now contend that this hearing itself did not comport with due process. At that hearing the trial judge heard evidence of Powell's present mental condition and dangerousness and determined that the evidence justified Powell's continued detention. The sufficiency of the evidence for this determination was upheld by the Florida Supreme Court in Powell's state habeas corpus proceeding. *Powell v. Genung,* 306 So.2d 113 (Fla.1974). Although Powell's commitment between June 1973 and March 1974 was in violation of his due process rights, we agree that because of the March 1974 hearing he is not now entitled to habeas corpus relief on due process grounds.

B.   *Equal Protection.* Powell's equal protection claim asserts that the procedures afforded prior to and at the March 6, 1974 hearing were not identical to the civil commitment procedures required by Fla.Stat. Ann. §§ 394.463 & 394.467. This dissimilarity, according to Powell, violated his right to equal protection under the teachings of *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct.

---

At this hearing in June 1977, an expert in psychology who had testified at Powell's murder trial in 1973 and who had examined Powell on several occasions testified that Powell, because of his chronic brain damage, has a greater propensity than the average person to commit unacceptable social behavior when he is

under the influence of a drug such as alcohol. At Powell's murder trial, this same expert testified that Powell did not know right from wrong when he killed the victim because of his chronic brain damage accompanied by cocaine intoxication.

760, 15 L.Ed.2d 620 (1966), and *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). These decisions do not control Powell's case. Neither *Baxstrom* nor *Jackson* dealt with the special problems presented when one is found not guilty of what would have otherwise been a criminal offense because of his insanity at the time of the offense.

In *Baxstrom* the Court held that New York cannot commit a prisoner to a mental institution at the end of his prison sentence on the finding of a surrogate judge when the state makes a jury trial available to all other persons civilly committed. Although the Court acknowledged that equal protection does not require all persons to be dealt with identically, it could conceive of no rational basis for distinguishing the commitment of a person nearing the end of a prison term from all other civil commitments for the purpose of granting judicial review before a jury on the question whether the person is mentally ill and in need of institutionalization. 383 U.S. at 111–12, 86 S.Ct. at 763.

The Supreme Court later explained its concern with a state's depriving one class of persons of a jury determination on the questions of mental illness and potential for doing harm while it grants a second class the right to a jury determination of those issues in *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), as follows:

> Like most, if not all, other States with similar legislation, Wisconsin conditions [confinement for compulsory psychiatric treatment] not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty. In making this determination, the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment.

405 U.S. at 509, 92 S.Ct. at 1052 (footnotes omitted). The *Humphrey* Court went on to remand the case for an evidentiary hearing to determine whether any justification existed for depriving persons committed under Wisconsin's Sex Crimes Act of the jury determination afforded to persons committed under the state's Mental Health Act.[8]

*Jackson* involved the pretrial commitment of an incompetent criminal defendant. There the Supreme Court held that Indiana deprived Jackson of equal protection "by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by [Indiana's regular civil commitment statutes]." 406 U.S. at 730, 92 S.Ct. at 1854. Since the defendant in *Jackson* had never been tried for the crimes of which he was accused, there was no finding and little suggestion that he was dangerous.

Although *Baxstrom* and *Jackson* do not address the problem of how to treat insanity acquitees, the District of Columbia Circuit has had occasion to consider this precise problem in light of these Supreme Court decisions. See *Bolton v. Harris,* 130 U.S. App.D.C. 1, 10, 395 F.2d 642 (1968); *United States v. Ecker,* 177 U.S.App.D.C. 31, 543 F.2d 178 (1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788,.50 L.Ed.2d 779 (1977); *United States v. Jackson,* 179 U.S.App.D.C. 375, 553 F.2d 109 (1976). *Bolton* held that insanity acquitees, before they can be committed, "must be given a judicial hearing with procedures substantially similar to those in civ-

8. Under the Sex Crimes Act, if a trial judge determined that a crime was probably sexually motivated he could, after a hearing to determine whether special treatment was needed, commit the defendant to an institution for treatment rather than send him to prison. Under the Mental Health Act, the right to jury determination of whether the commitment standards were met existed.

il commitment proceedings," but it tempered its holding by acknowledging that a state can treat a person acquitted by reason of insanity differently from other civilly committed persons to the extent that the distinction has some relevance to a legitimate state interest. 130 U.S.App.D.C. at 10, 395 F.2d at 651; see Baxstrom v. Herold, 383 U.S. at 111, 86 S.Ct. at 763 ("Equal protection does not require that all persons be treated identically"). In Ecker the court upheld such a distinction, holding that the dangerousness demonstrated by a person's commission of a criminal act and subsequent acquittal by reason of insanity provides a rational basis for requiring judicial approval for the release of the insanity acquitee when such approval is not required for the release of one otherwise civilly committed. See also United States v. Jackson, supra.

■ We agree with the holdings in Bolton and Ecker that a state must afford insanity acquitees substantially the same protections that it gives persons committed under the ordinary civil commitment statute, but that different procedures may be valid if they relate to a legitimate state interest. In today's case Powell received the substantive protections of Fla.Stat.Ann. § 394.467. His continued commitment after March 12, 1974, depended on the trial judge's findings that Powell then was psychotic and remained a manifest danger to himself and others. Thus, this case does not involve the denial to petitioner of a jury determination of dangerousness which was available to another class, as was the case in Baxstrom and Humphrey. In Florida such a jury determination is available to no one.

The district court held that Powell was denied equal protection since he was committed notwithstanding the fact that the hospital administrator and Powell's treating physicians recommended that he be released. Under § 394.467 one could not be committed unless the hospital administrator and two examining physicians recom-

mended commitment based on their opinions that both criteria for involuntary commitment were met.[9]

■ Although civil commitment in Florida depends upon the opinions of physicians who have examined a person that the person is (i) mentally ill and (ii) likely to injure himself or others, i. e., dangerous, those opinions are not controlling, per se. The final determination to commit depends upon a judicial decision made after a hearing at which at least one of the physicians must testify. In order to determine whether Florida may allow the judge a greater role in cases involving insanity acquitees than he plays in other civil commitment cases, it is necessary to consider what each of the two criteria for commitment entails.

■ The first criterion, that the person is mentally ill, is strictly a medical judgment that the judge can render only with the assistance of expert medical knowledge. This requirement is to assure that only the truly mentally ill are hospitalized. Equal protection prohibits the judicial commitment of an insanity acquitee in Florida without an underlying medical judgment that he is mentally ill. Similarly, a judge cannot reject unanimous medical opinion that the insanity acquitee is not mentally ill when the judge does not have such power in all other civil commitment cases.

From the state of the record before us, it appears that the state trial judge's finding in March 1974 that Powell remained mentally ill was consistent with the medical opinions of Powell's treating physicians. According to the clinical summary before the judge, Powell's final diagnosis was "Psychosis with Drug Intoxication (Cocaine), in remission." Whether this is sufficient to constitute mental illness within the meaning of Florida's commitment statute is a matter of Florida law, and the trial judge's finding that it was sufficient either was not attacked or was upheld by the Florida Supreme Court in Powell's state habeas proceeding. Unless Powell's treat-

**9.** The Florida state court judge rejected these recommendations because they were based on the faulty premise that the court would have

continuing jurisdiction over Powell after his discharge and thus would be able to recognize and prevent future narcotic intoxication.

ing physicians disavowed this diagnosis at the March 6, 1974 hearing, the transcript of which is not before us, the state trial judge's finding that Powell was mentally ill was supported by the medical opinion as required in all other civil commitment cases.

The second criterion, that the person is dangerous, presents a mixed question involving both a legal and social judgment as well as a medical opinion. The purpose of this requirement is to assure that only those whose potential for doing harm is great enough to justify the deprivation of their liberty are committed. *See Humphrey v. Cady,* 405 U.S. at 509, 92 S.Ct. at 1052 (quoted above). Since this determination does not lie solely within the realm of expert medical knowledge, a state may reasonably allow the judge to play a greater role in making this determination about insanity acquitees than he plays in other civil commitment cases. In the mix of considerations involving whether an insanity acquitee should be hospitalized, there is a jury determination that the acquitee committed an act that would have been criminal but for his insanity at the time. Powell's situation thus differs substantially from the pretrial commitment in *Jackson.* Powell's dangerousness to society because of his mental condition has been established by anti-social behavior, the killing of another human being. This past conduct justifies a greater role for the trial judge in determining whether an insanity acquitee remains dangerous to society in order to protect society from similar behavior in the future. *See United States v. Ecker,* 177 U.S.App.D.C. at 47–52, 543 F.2d at 194–99. The rationality of such a scheme is illustrated by the present case, where the trial judge rejected the examining physicians' determination that Powell would not be dangerous if discharged since he knew this medical opinion was based on the faulty premise that the court would have continuing jurisdiction over Powell after his discharge and would be able to recognize and prevent future narcotic intoxication.

Despite the fact that the Florida court did not deny Powell equal protection by committing him notwithstanding medical opinions based on an incorrect factual assumption that Powell would be supervised if released, there would be an equal protection violation if these medical opinions were rejected without the oral testimony of at least one of Powell's examining physicians at the March 6, 1974 hearing. Florida requires such oral testimony in civil commitment proceedings in order to assure the full interaction of medical and legal judgments before commitment is permitted. There is no reasonable justification to deny this protection to insanity acquitees, particularly when their commitment is accomplished by the judge's rejection of a physician's opinion that the acquitee would not be dangerous if released. Since the record before us does not contain a transcript of the hearing held March 6, 1974, we do not now know who testified at that hearing.

Finally, we agree with the holdings of the district court and of the District of Columbia Circuit in *Ecker* that the prior anti-social conduct of an insanity acquitee justifies treating such a person differently from ones otherwise civilly committed for purposes of deciding whether the patient should be released. *See also United States v. Jackson,* 179 U.S.App.D.C. 375, 553 F.2d 109 (1976).[10] Therefore, Florida's system of allowing those committed under Fla.Stat. Ann. § 394.467 to be released solely on the recommendation of the hospital administrator but requiring court approval before those committed after an insanity acquittal can be released passes constitutional muster. Powell was not deprived of equal protection simply because the trial judge refus-

---

**10.** The basis for commitment of an individual acquitted by reason of insanity is his "dangerousness" to society. In determining the existence of that dangerousness a court should focus upon the patient's behavior and must predict whether that behavior demonstrates that the patient, if released, would pose a substantial threat of harm to himself or others. While an initial commitment of an acquitee may well focus upon the crime committed, the release of an individual committed by reason of insanity more properly looks to that individual's behavior since the crime to determine whether or not his recent behavior demonstrates his continuing dangerousness.

ed to order his release after the hospital administrator recommended that he be discharged.

### V.  Conclusion

The requirement of judicial approval before Powell can be released does not violate the equal protection clause.  Although Florida's initial commitment of Powell was accomplished in violation of both the due process and equal protection clauses, the due process violation was cured by the judicial hearing held in March 1974.  The equal protection violation also may have been cured by that same hearing.  On remand the district court should obtain the transcript of that hearing if it is available; otherwise it should take additional evidence to establish what occurred at that proceeding.  If at least one of Powell's examining physicians testified at that hearing and if it was shown that the examining physicians persisted in their diagnosis of psychosis with drug intoxication, in remission, then Powell's continued commitment after March 1974 was not in violation of the equal protection clause.

VACATED AND REMANDED.