This case involves the involuntary commitment of a mentally ill person, hereinafter sometimes referred to as the patient, to the custody of the State Department of Mental Health for proper treatment of her illness.
Unquestionably the patient suffers from a mental disease. The issues before this court are: first, did she pose a real and present threat of substantial harm to herself or to others and manifest such by a *Page 476 
recent overt act; second, was commitment the least restrictive alternative necessary and available for the treatment of her illness; and, third, whether § 22-52-10, as amended, of the Code of Alabama of 1975 was unconstitutionally applied in her commitment? Only substantial facts bearing upon such issues will be summarized herein.
The appellant and her niece had been lodged in a boarding house which was certified each ninety days by the State Department of Mental Health for the care of disturbed adults. She had been most protective of her almost completely helpless niece. For example, the niece disliked bathing and the appellant would protest when the management of the boarding house would suggest that the niece bathe or when they supervised her baths. The problem became so aggravated that the appellant and her niece were assigned to different houses.
Evidently the appellant was also averse to bathing. She had not had a bath for a week when the boarding house operator asked her to bathe, whereupon the patient refused and locked herself in the bathroom from 10:00 A.M. until after 4:00 P.M., when the operator went to the courthouse and filed the present commitment petition against the appellant.
When she was last released from the hospital her prescription for Resperine required her to take four pills per day. They were effective until the dosage was reduced by one-half. Her behavior became more bizarre and she refused to take her medication. Subsequently, her behavior became so difficult that, on three different occasions, the operator called the police to remove her from a house, to make her go home for the night.
Approximately three weeks before the commitment hearing, the appellant was using foul language towards a teacher at the boarding house. When a part time employee attempted to calm her, she picked up a chair and later pushed the worker around the room when the worker took her arm to lead her out.
There was evidence that when this appellant was asked to do anything she would become upset and begin verbally lashing out, cursing.
A resident physician in psychiatry testified that this patient had been admitted to University Hospital on three occasions. She suffers from paranoid schizophrenia, which is a psychotic mental disease where persons are afraid that other people will harm them in some manner and they have delusions about this, which can cause such mentally ill persons to react, sometimes violently, towards others. This patient daily consistently stated that the people at the boarding house were trying to harm her. The appellant stated to the probate judge that most people try to harm her.
Treatment is available for her in the form of pills to be taken by mouth. The doctor further testified that confinement would be necessary for her safety and well being or the safety and well being of others since she was not under good control at that time as to her mental illness. The doctor further expressed the judgment that she presented a real and present threat of substantial harm to herself or to other people. The threat to herself was because of the poor judgment which she then possessed. She even refused to take her medicine while in the hospital. Because of her condition, the doctor was of the opinion that Bryce Hospital would provide the least restrictive confinement and the means for her treatment. Other alternatives such as the boarding house had been unsuccessfully tried but they failed because of her lack of cooperation and failure to take her medicine.
The patient apparently has no friend or relative who could, or would, take her into their home, and she has no place to go for care and treatment.
At the conclusion of the evidence the probate judge made the following observations:
 Q Well, I don't know what to do with you except I've got to get you some more medicine, so I guess I'm going to have to have you committed to the State for *Page 477 
further observation and treatment. That's to see if you can't get a little better. We've got to get you a place to stay.
. . . . .
 Judge Reynolds: I sure would like for someone to take this up on appeal and see what the Supreme Court is going to say where we can send these people. I just . . . I doubt if we meet the statutory requirements. You've got a very negative situation as far as the overt act. But for this woman's sake, I've got to get her some place to sleep and some place to eat. I don't have any other choice. There is nowhere I can turn her aloose to. If I had anybody to take care of her, I would let them, but I don't have anybody.
. . . . .
 Mr. Higgins: I don't know whether you've stated on the record a finding of fact concerning the overt act. I would like that on the record.
 Judge Reynolds: I don't point out any particular act, I just tell you that I find there is sufficient basis to cause her to be detained. On the Final Hearing I find that there is sufficient basis on which to justify her commitment to the State Department of Mental Health authorities for treatment.
After the hearing, the final order of commitment contained this language:
 [T]he Court is therefore of the opinion from the clear, unequivocal and convincing evidence that,
 1. The said Willie Mae Walker is mentally ill and poses a real and present threat of substantial harm to herself and to others.
 2. The said danger to herself and others has been evidenced by recent overt acts.
 3. There is care and treatment available for the illness diagnosed.
 4. Confinement in a hospital is necessary for said individual's safety and well-being and for the family's and community's welfare.
 5. Commitment is the least restrictive alternative necessary and available for the treatment of her illness.
 IT IS, THEREFORE, ORDERED BY THE COURT that said Willie Mae Walker be committed to the custody of the State Department of Mental Health for proper treatment of her illness.
The guardian ad litem appeals and raises the issues heretofore enumerated.
In Lynch v. Baxley, 386 F. Supp. 378 (M.D.Ala. 1974), in the majority opinion written by Judge Johnson for the three judge district court panel, most of Alabama's legislation as to the involuntary commitment of insane persons was held to be unconstitutional because of multiple violations of the due process clause of the constitution. In lieu of the statutes, certain definite procedural and substantive due process minimum requirements for involuntary commitments to any of Alabama's mental institutions were imposed by the court. Subsequently, the Alabama legislature adopted the court's requirements. §22-52-10, as amended, Code of Ala. 1975. The probate judge's finding of fact in his final judgment followed the language of the statute.
The issues raised in this case involve questions of fact. The probate judge personally heard all of the evidence at the commitment hearing. The usual presumption of correctness applies if the evidence supports his findings. We are not authorized to disturb his factual findings contained in the final judgment unless he was clearly and palpably wrong. These rules of law, however, must be applied in joint consideration with the high burden of proof required in cases of this nature.
In Lynch v. Baxley, supra, on due process grounds, it was held that "the trier of fact must be persuaded by clear, unequivocal, and convincing evidence that the subject of the hearing is in need of confinement under the minimum standards for commitment herein enumerated." Id. at 393. The same "clear, unequivocal, and convincing" standard of proof was accordingly adopted by the legislature (§ 22-52-10, as amended) and the probate judge, in the final judgment *Page 478 
in this case, stated that she should be committed because he was of the opinion from the clear, unequivocal and convincing evidence of the existence of such requirements for involuntary commitment.
In 1979, the Supreme court of the United States spoke for the first time as to the measure of proof required in involuntary commitment cases. They decided that such proof must be "clear and convincing," a burden in between our "reasonably satisfied" in most civil cases and "beyond a reasonable doubt" in criminal cases. Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804,60 L.Ed.2d 323 (1979). The Supreme Court rejected the argument that due process required that the word "unequivocal" be included in such standard because "[T]he term `unequivocal', taken by itself, means proof that admits of no doubt, a burden approximating, if not exceeding, that used in criminal cases." Id. at 432, 99 S.Ct. at 1812. In further discussing such problem, the court stated:
 We have concluded that the reasonable doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment. Similarly, we conclude that use of the term "unequivocal" is not constitutionally required, although the states are free to use that standard. To meet due process demands, the standard has to inform the fact-finder that the proof must be greater than the preponderance of the evidence standard applicable to other categories of civil cases.
 We noted earlier that the trial court employed the standard of "clear, unequivocal and convincing" evidence in appellant's commitment hearing before a jury. That instruction was constitutionally adequate. However, determination of the precise burden equal to or greater than the "clear and convincing" standard which we hold is required to meet due process guarantees is a matter of state law which we leave to the Texas Supreme Court. . . .
441 U.S. at 432-433, 99 S.Ct. at 1812.
Were it not for code section 22-52-10, as amended, we would here hold that the burden of proof in involuntary commitment proceedings would now be "clear and convincing" because of Chief Justice Burger's opinion in Addington. However, our legislature has spoken and we are without authority to alter the statute since states may include, but are not required to adopt, the higher "unequivocal" standard. If "unequivocal" is to presently be eliminated from the statute, the legislature is the proper body to do so. We pretermit, as being beyond our prerogative, a determination as to whether the court from whence Lynch v. Baxley, supra, emanated should be asked to ratify any such legislative change.
We, therefore, look to all of the evidence, taking into consideration the very high burden of proof in these cases, to ascertain if there is any competent evidence which sustains the judgment of the probate judge as to any of the issues raised upon this appeal. We are cognizant that the trier of facts weighs the evidence. While some of the trial judge's statements from the bench indicate some doubt as to the sufficiency of proof as to a requisite overt act, the formal written final judgment controls and therein he stated that under the clear, unequivocal and convincing evidence the enumerated necessary requirements for her commitment existed.
 I
Did the appellant pose a real and present threat of substantial harm to herself or to others and manifest such by a recent overt act?
Since this requirement was imposed into the law of Alabama by means of the decision in Lynch v. Baxley, supra, it is most helpful to review the wording of that case to ascertain what was meant by a finding of dangerousness.
 Although dangerousness to self and dangerousness to others are frequently considered together, it is clear that they *Page 479 
actually represent quite different state interests. Commitment on account of dangerousness to others serves the police power, while commitment for dangerousness to self partakes of the parens patriae
notion that the state is the ultimate guardian of those of its citizens who are incapable of caring for their own interests. See In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648, 658 (1973). Valid exercise of the parens patriae power presumes an incapability to manage one's affairs that approximates, if it is not identical with, legal incompetence to act. Consequently, in order to deprive a person alleged to be a danger to himself alone of the right to choose between treatment and liberty, the state must first demonstrate that, because of his mental illness, he lacks the capacity to weigh for himself the risks of freedom and the benefits of hospitalization.
 A finding of dangerousness indicates the likelihood that the person to be committed will inflict serious harm on himself or on others. In the case of dangerousness to others, this threat of harm comprehends the positive infliction of injury — ordinarily physical injury, but possibly emotional injury as well. In the case of dangerousness to self, both the threat of physical injury and discernible physical neglect may warrant a finding of dangerousness. Although he does not threaten actual violence to himself, a person may be properly committable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable.
 (c) The danger posed by the person to be committed has been evidenced by a recent overt act. Due process requires that the need for confinement be based upon a substantial likelihood that dangerous behavior will be engaged in unless restraints are applied. While the actual assessment of the likelihood of danger calls for an exercise of medical judgment, [8] the sufficiency of the evidence to support such a determination is fundamentally a legal question. A mere expectancy that danger-productive behavior might be engaged in does not rise to the level of legal significance when the consequence of such an evaluation is involuntary confinement. To confine a citizen against his will because he is likely to be dangerous in the future, it must be shown that he has actually been dangerous in the recent past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or to another. Lessard v. Schmidt, 349 F. Supp. [1078] at 1093; Cross v. Harris, 135 U.S.App.D.C. 259, 418 F.2d 1095, 1102 (1969); cf. Millard v. Harris, 406 F.2d [964] at 973. (Footnote omitted.)
386 F. Supp. at 390-391.
We forego any decision as to whether the evidence as to actual violence towards others was sufficient in this case, for we are of the opinion that the evidence indicates discernible physical neglect. While we have considered all of the evidence in reaching such opinion, we set forth some of the testimony especially. The police were called on three separate occasions to return her to the boarding home at night. She refused to take her necessary medication both in the boarding home and in the hospital. She had not taken a bath for a week, and, when requested to bathe, the appellant locked herself in the bathroom for over six hours. She verbally abused almost everyone and was suspicious of all persons. She neglected herself and refused to care for herself.
The probate judge could have readily found from the evidence that such constituted a real and present threat of substantial harm to her well being. She was clearly incompetent to determine whether she desired treatment for her mental disease.
By making proof of refusing medication and of her locking herself in the bathroom for six hours, the state met its burden as to *Page 480 
proof of recent overt acts manifesting her neglect of herself, the endangerment of herself.
The evidence of discernible physical neglect was adequate to warrant a finding of dangerousness to self. The evidence of a recent overt act was likewise sufficient, "overt" being "open; manifest; public; issuing in action. . . ." Black's Law Dictionary, 5th Ed., at 995.
 II
In view of the appellant's mental condition, and the other factual findings, the probate judge had a duty to order treatment, but did he err in ordering commitment as being the least restrictive alternative necessary and available for treatment of her mental illness? We find no error in the action of the trial judge. No relatives were available to care for her. A boarding home had been tried and it failed. Even full time hospitalization pending the hearing was not successful in administering medication to her. Due to her mental condition and to the lack of any other viable alternative at the time of the hearing, the probate judge had no other real alternative but to order her committed for treatment as well as to provide food and shelter pending such treatment.
In this regard, Lynch v. Baxley, supra, placed the following burden upon the state:
 Specifically, the state, which knows or has the means of knowing the available alternatives, must bear the burden of proving what alternatives are available, what alternatives were investigated, and why the investigated alternatives were not deemed suitable. Lessard v. Schmidt, 349 F. Supp. at 1096.
 Moreover, it should be pointed out that due process does not preclude, and indeed may require, commitment of a person suffering from a mental illness to an environment other than full-time confinement in Bryce or Searcy Hospital. Possible alternatives include voluntary or court-ordered out-patient treatment, day treatment in the hospital, night treatment in the hospital, placement in a private hospital, placement in the custody of a willing and responsible relative or friend, placement in a nursing home, referral to a community health clinic, home health aide services, and prescribed medication.
386 F. Supp. at 392.
The responsibility was fully met by the evidence in this case.
 III
The appellant urges that her commitment represents an unconstitutional application of the Alabama involuntary commitment statute. Since we have decided that there was no failure of proof as to the two mandatory elements previously discussed, the statute was not applied to the appellant in an unconstitutional manner.
The guardian ad litem for the appellant represented her well in the probate court. He filed an excellent brief on her behalf with this court. In some instances, attorneys view their appointments as guardians ad litem as being purely perfunctory, a mere legal formality to be tolerated. Admirably, such was not the case here. Her appointed counsel gave to his client his professional best in the highest tradition of his honored profession. We commend his efforts on her behalf.
This case must be affirmed since the probate judge was not clearly and palpably wrong. We cannot substitute our judgment for his since there was competent evidence which supported his findings.
The foregoing opinion was prepared by retired Circuit Judge EDWARD N. SCRUGGS, serving on active duty status as a judge of this court under the provisions of § 12-18-10 (e), Code of Alabama 1975. His opinion is hereby adopted as that of the court.
AFFIRMED.
All the judges concur. *Page 481