Dudley Earl Carlisle was indicted in February of 1983 for the murder of his brother, Joel Nelson Carlisle. He entered a plea of "not guilty by reason of insanity" to this offense, and the State joined issue in this plea.
On March 14, 1983, a hearing was held to determine if appellant Carlisle should be involuntarily committed to the custody of the Alabama State Department of Mental Health, pursuant to the provisions set out in § 15-16-41 through 43, Code of Alabama 1975.
Following this hearing, the court determined that the appellant suffered from a mental illness, and as a result of this mental illness, he posed a substantial danger of physical harm to himself or to others. After determining that confinement was the least restrictive manner to treat the appellant, the court ordered him to be committed to the custody of the Department of Mental Health.
On June 19, 1985, the appellant filed a petition for a writ of habeas corpus seeking his release from custody of the Alabama Department of Mental Health. Following a hearing, the trial court denied that petition. This is an appeal from the court's denial of the appellant's petition for writ of habeas corpus.
At the hearing on the petition at issue, Dr. James Edward Kimbrough, a psychiatrist and the Clinical Director at Searcy Hospital, testified that in November of 1985, a review committee was empaneled for the purpose of determining whether this appellant should be released from Searcy Hospital. Kimbrough was a member of the committee as were Doctors A.G. Arnold, Beverly Brylski, Patricia McCleary, and Claude Brown.
The committee's diagnosis of the appellant was that he still suffered from paranoid schizophrenia but that this mental illness was in remission because the appellant was on medication. Their conclusion was that the appellant should not be released unless there were some strict release plans instituted so that the appellant's behavior and medication could be monitored.
Dr. Kimbrough testified that he felt that, if the appellant quit taking his medication, there was a high percentage that the appellant "would become psychotic again, if pressed" "under stress." (R. 9) He stated that, if the appellant became psychotic again and became stressed, he could pose a danger to himself or others.
Dr. Kimbrough testified that the appellant had received maximum benefits from hospitalization and that he doubted his continued hospitalization could improve his condition. He stated that the committee was in agreement that the appellant could be released if outside structures could be assured. Kimbrough characterized outside structure as ways to avoid stress and assure that the appellant would continue on his medication. He stated that the committee's reservation about the appellant's release was that there were no assurances or guarantees that the appellant would continue taking his medication once he was released.
Kimbrough told the court that there are outside structures available to the appellant but neither he nor anybody within the Department of Mental Health could guarantee that these structures would be utilized. He stated that once the appellant leaves the hospital, he is on a six-month trial visit. Once this six month period passes, the hospital has "absolutely no control over them," "but the Department frequently gets held responsible for what they do after they leave the hospital. . . ." (R. 19-20)
Kimbrough testified that he received a letter, dated October 23, 1985, from Calvin Clay, an attorney for Joel Nelson Carlisle's wife. This letter reads, in part, as follows:
 "I am aware of the fact that some doctor or doctors have to certify in writing that they feel as though someone like Dudley Carlisle is capable of being placed back into society, and I would by this letter demand to know the name of the doctor or doctors who have so indicated in writing that they feel he is able to be placed back into society. *Page 152 
 "I want to make it extremely clear to your hospital and to the doctors that I have every intention of bringing action against them in the event that Dudley Carlisle harms or threatens to harm in any way, shape or fashion my client or any other person, because I clearly think that the hospital and the doctors involved are negligent at the outset in placing him back into society at this early date.
 "I am also aware of the fact that Terry Bartlet of Searcy Hospital has already told Mrs. Carlisle that it was against his better judgment that Mr. Carlisle was being placed back into society, so we know at least one person from Searcy who disagrees with this release.
 "I look forward to receiving the names of those people responsible for Dudley Carlisle's release and want to again assure you that I hold Searcy Hospital and those doctors responsible for any consequences that may occur as a result of this release." (R. 102-103.)
This letter was received prior to the committee's decision not to release the appellant but after the committee had agreed to allow the appellant to leave the hospital for temporary outside visits. There were no problems encountered on any of the appellant's ten visits away from the hospital. Kimbrough stated that the committee was in agreement that the appellant "could be released if outside issues can be resolved." (R. 19)
Patricia McCleary, the Director of Psychological Services at Searcy Hospital, testified that she was on the committee which reviewed the appellant's petition for release. She stated that, at the time of the review hearing, the committee felt that the appellant was not acutely psychotic and was in remission on medication and in the structured environment of the hospital. However, the committee could not advocate the appellant's release without guarantees of continued structure in the community.
McCleary testified that the committee, in reaching its decision denying the appellant's release, took into consideration "the nature of the crime committed [and] the concerns expressed by the widow of the man killed." (R. 30) McClearly expressed some reservation about the review board allowing the appellant's temporary visits to continue "until some clarifications could be obtained in terms of the concerns expressed by the widow of the deceased." (R. 35)
McCleary told the court that, in her opinion, the appellant would become psychotic again if he quit taking his medication. In this situation, the possibility existed that the appellant might become dangerous to himself or others. She stated that neither she nor anyone else on the review board was a member of the appellant's treatment team.
McCleary testified that people who are mentally ill and on medication are released everyday from the hospital. She said that the appellant had attained maximum hospitalization benefits and could be released if outside structure could be assured. Following this witness, the State rested its case.
Dr. Stonewall Stickney testified that he had frequent contact with the appellant because he was the appellant's treating psychiatrist and the head of the appellant's treatment team at Searcy Hospital. He stated that the appellant became mentally ill in 1972. From 1972 until 1982, the appellant was working for the railroad, taking his medication and seeing a psychiatrist on a regular basis. Then, within a short period of time, the appellant "was faced with extraordinary stress. The first was the death of his mother, and then shortly afterwards the violent death of his father with himself as an eyewitness and casualty." (R. 41)
Under these circumstances, appellant quit taking his medication and became psychotic again. The appellant began having delusions and thought people were out to get him. This precipitated the appellant's attack on his brother.
Stickney testified that the appellant has been symptom-free since the Spring of 1985. He is housed in the open section at the hospital and he has ground privileges. The appellant is not considered an elopement or violence risk. Stickney stated that *Page 153 
the appellant's temporary outside visits went well. He believes the appellant is mentally competent to engage in contracts and other similar transactions.
Dr. Stickney testified that the appellant had received the maximum benefits of hospitalization and he saw no reason to detain the appellant. Stickney stated that a relapse was possible if the appellant quit taking his medication and again was confronted with overwhelming stress. He believes that the chances of the appellant being confronted with such a stressful situation were small, and that, even if a relapse occurred, it would not necessarily be violent.
Stickney stated that a relapse would be unlikely if the appellant stayed on his medication and saw an outside psychiatrist regularly. He testified that a person's condition would not deteriorate until that person had been off medication for several weeks because the medication remains in the body for several weeks. If a psychiatrist saw the appellant regularly, he would most probably detect a relapse before it turned into anti-social action.
When asked by the State what guarantee he could offer the court that the appellant would continue on his medication if released, Stickney replied:
 "I have no guarantee, but what I count on is that Mr. Carlisle is an intelligent man with a good stable work record. He has had a perfectly soul-searing and awful experience in which he has done something that he would never do in his right mind and he has been through a great deal of misery already because of it. He knows the remedy. He knows how to prevent it. I don't think he would voluntarily turn away from the remedy that — expose himself to such hazard." (R. 49)
Stickney stated that the appellant was not dangerous at the present time and he recommends the appellant's release.
Billy Ray Carlisle testified that he is the brother of the appellant and Joel Nelson Carlisle (who was killed by the appellant). He stated that the appellant was initially diagnosed as mentally ill in 1972 following a breakdown. At that time, the appellant was placed on medication. He remained on medication and sought psychiatric treatment from 1972 until 1981. During this period, the appellant exhibited no violent behavior.
In November of 1980, the Carlisle brothers' mother died. Before her death, she had been in conflict with her brother (the Carlisle brothers' uncle) over their mother's estate. Following Mrs. Carlisle's death, the conflict intensified between her brother and the Carlisle brothers' father. In April of 1981, the uncle shot and killed the father. The appellant was an eyewitness to this event and was also shot at the time by his uncle. The appellant drove his father to the hospital but the father died on the way there.
Following their father's death, the brothers had a difficult time with the criminal justice system in Mississippi where the killing occurred. The Mississippi authorities were reluctant to prosecute the uncle for their father's death. At trial, the uncle was found not guilty. This experience was particularly difficult for the appellant because he was a major witness before the grand jury and at trial. The entire family, including the appellant, was frustrated after the trial because they believed that justice had not been done. The family even attempted to contact "60 Minutes" to investigate this situation.
After the trial, the appellant became paranoid and believed his uncle had people out to get him. Billy Ray and Joel Nelson thought about committing the appellant but decided against it. The appellant then killed Joel Nelson.
After the appellant was committed, Billy Ray kept in contact with his brother. The appellant had been on ten to twelve weekend visits to his home and each of them went well. During these visits, Billy Ray saw no evidence of threats by the appellant to anyone.
Billy Ray testified that, if the appellant were released, he would maintain close contact with the appellant and monitor him and encourage him to see the doctor. Billy *Page 154 
Ray stated that he would recognize the symptoms if the appellant became sick again and would alert the authorities in this event.
Billy Ray told the court that he could not guarantee that the appellant would continue on his medication but he could guarantee that he would report it if he found out the appellant had discontinued his medication.
Billy Ray stated that the appellant could work again for his former employer if released. He said that he had no reservations about the appellant's release and he wants to see him released.
Dr. Charles Herlihy, Jr. testified that he is a psychiatrist and has seen the appellant about eight times. The appellant's visits to Herlihy were for the purpose of evaluating the appellant for potential outpatient treatment. If the appellant were released, Herlihy would see the appellant as an out-patient.
Herlihy stated that the appellant's schizophrenia initially surfaced in 1972. It was treated and went into remission at that time. The appellant did not suffer a relapse until the killing of his brother. Herlihy said that an unusual set of circumstances caused this relapse. He stated that the appellant's schizophrenia was again in remission and the appellant exhibits no active symptoms and there is no evidence of hostility or dangerousness.
Herlihy testified that, if the appellant were released, he would see the appellant regularly and would observe the appellant's behavior symptoms and monitor his medication in order to detect a relapse. Herlihy stated that the appellant would not likely suffer a relapse for several weeks if he quit taking his medication. He said that he could regularly check the appellant's blood level in order to detect if the appellant was on his medication.
Herlihy stated that the longer a person goes without suffering a relapse, the less likely that person is to experience such a relapse. Further, persons with a support system are less likely to suffer a relapse. He felt that the fact the appellant could return to his old job was also advantageous.
Herlihy stated that a relapse is unlikely if the appellant engages in post-hospital therapy and remains on his medication. He also believed that the appellant's brother could recognize a relapse since the symptoms would be similar to those exhibited during the first relapse.
Herlihy testified that he could not guarantee that the appellant would remain on his medication or see him, but he stated that the appellant wants to participate in psychiatric treatment and realizes it is in his best interests to do so. Herlihy would recommend the appellant's release.
Dr. Virupaksha Kothandapani testified that he was the appellant's treating psychologist and he saw the appellant on a weekly basis from March until October of 1985. Kothandapani administered various tests to the appellant and performed a personality evaluation of him. The appellant has an I.Q. of 121 which is in the superior range. His intellectual, emotional, and adaptive functioning is good and he showed no signs of anger, hostility or tension. Kothandapani did not find any indication of active psychosis in this appellant. The appellant is considered a good candidate for rehabilitation.
Kothandapani was a member of the first review committee whose purpose it was to determine if the appellant was ready for temporary visits outside the hospital. The committee allowed the appellant to leave the hospital on these temporary visits and concluded that "[t]he treatment team may make discharge plans when satisfied with Mr. Carlisle's progress." (R. 83) The appellant went on thirteen or fourteen temporary visits and each of them went well.
Kothandapani stated that there are several criteria he uses in determining whether an insanity acquittee is ready to be released from the hospital. They are: (1) admission of guilt by the patient in a sincere manner, (2) the patient's ability to articulate resolution of the stresses provoking the incident, (3) the patient's fantasies and delusions, (4) the patient's behavior during hospitalization, (5) how the staff *Page 155 
feels about the patient, (6) whether the patient has achieved the maximum benefits from hospitalization, (7) change in community circumstances, and (8) seriousness of the anticipated conduct.
Kothandapani told the court that the appellant had met all these criteria except change in community circumstances and the appellant had no control over this criteria. Based on his evaluation, Kothandapani concluded that the appellant would be released if he had out-patient contact and monitoring and a job. He testified that the appellant had a job upon his release and that Billy Ray Carlisle showed a lot of interest in the appellant and was very supportive. Kothandapani stated that the symptoms of deterioration into a relapse would be noticeable to the appellant's brother and others who were close to him. He believed it would take overwhelming stress to cause another relapse in the appellant.
Kothandapani could not guarantee the appellant would continue on his medication but he stated that the appellant was motivated and willing and wanting to cooperate in any way. He stated that other insanity acquitees had been released from the hospital into a structured environment. After Kothandapania's examination, the following conversation took place between the court and Kothandapani.
 "THE COURT: Let me ask you several questions. To my knowledge you've been at Searcy Hospital nine to ten years at least. How long have you been there?
"WITNESS: Close to ten years, Your Honor.
 "THE COURT: This Court had nothing to do with authorizing those 13 or 14 —
"WITNESSES: Temporary.
"THE COURT: — visits, did they?
"WITNESSES: No, sir.
"THE COURT: None what —
"WITNESS: I don't know but —
"THE COURT: None whatsoever, right?
"WITNESS: No, sir.
 "THE COURT: Why are we here? Why are we in this courtroom today?
 "WITNESS: I would say that we want to be very careful and cautious in letting somebody go —
 "THE COURT: Doctor, isn't it a fact the reason we're here is because Searcy Hospital will not release him and they want the Court to release him?
Isn't that putting in its lowest level, simplifying it?
 "WITNESS: I would say that the onus of responsibility has to be diffused here. There is a tendency to — not to take the responsibility completely on any one shoulders, and therefore if the Court as well as the hospital shared this responsibility, then the burden —
 "THE COURT: What I'm trying to say, they didn't ask me to share the 13 visits though, did they?
"WITNESS: No, I guess not.
 "THE COURT: So, we're here simply because the — those responsible at Searcy Hospital have said he will not be released unless we have a, quote, structured environment and apparently those at Bryce (sic) are not satisfied of the structured environment because they had the authority to release him any day they wish to release him. Isn't that right?
"WITNESS: Yes, sir.
"THE COURT: Huh?
"WITNESS: You are right, sir.
 "THE COURT: All right. Now that we've got that out of the way, I guess another reason would be that — let me just refer to a case here. Knight v. State, which is a 1984 case out of the Court of Criminal Appeals. I think it went on to the Federal Court — no, that was Williams v. Wallace in the other one — testing the constitutionality of the Department of Mental Health, or whatever the broad name they go by in Alabama, double standard for people that are committed for civil problems and those that are committed for criminal problems. I think everyone would agree that there probably is a, quote, dual standard, would we not?
"WITNESS: Appears to be so.
 "THE COURT: All right. In this particular case the — a man named Price *Page 156 
Knight had been confined to a hospital, whether the first time was Bryce Hospital or not, I do not know, but I certainly have the ability to read. 'The evidence adduced at the hearing held in this case is that the Petitioner, Price Knight, had already been released from Bryce Hospital once. Once free he had stopped taking his medication and had killed a man.' And, of course, virtually the — in the Wallace case the same, quote, legal question is talked about in the Eleventh Circuit. . . .
". . . .
 "THE COURT: Let me ask you another question. In these two cases I referred to there's no question that both the Federal and the State court have held this treatment or differentiating between someone committed for a civil matter and criminal matters different and I think justifiably so. In the case I referred to a man's life was taken. The case we're here today a man's life was taken. So, I don't think there's any question about that. But from everyone that I have heard testify today, including all of those that are attached to Searcy Hospital — in fact, it's unanimous — that if this man returns to society in a, quote, structured, close quote, environment and, two, if he continued to take his medication, and if, if, if, if. If those responsible at Bryce (sic) Hospital were so absolutely concerned that this was going to happen, why haven't they released him, because they certainly under our legal system have the right to do so. Now, that's the question I ask you, and I saved it for you because I think you've been there the longest.
 "WITNESS: I think, Your Honor, I won't even assume to know the kinds of things that are needed to answer that question.
 "THE COURT: Well, from what I've heard today from every single person that's taken this stand, to and including his brother, who I'm sure is genuinely sincere in everything he says or he wouldn't be here, every single person that's taken this stand today says, you know, if this, if that, if this, if that. You know, we're dealing with a case here where a man's life was taken, and rather than go to the penitentiary he entered a plea of not guilty by reason of insanity. That was in effect concurred in by the D.A.'s office. That was in 1983 or in 1982, I'm not sure. When was it?
"MR. BREWSTER: Two.
 "THE COURT: '82. So, here we have three years later that some people want me to say, yeah, it's all right for you to go back, you know, if you take your medicine, if you do this, if you do that, and I keep, as I've done since the first witness took this stand, if the people at Bryce (sic) Hospital were so concerned that that was going to happen, why didn't they use the authority that they have instead of this young man filing a writ of habeas corpus for me to order him to be released from Bryce Hospital. I'm having a little problem with that.
"MR. BREWSTER: Your Honor, it's the —
 "THE COURT: And I'm not asking you. I'm asking Dr. Kothandapani.
 "WITNESS: You have put me in a very tough situation now, Your Honor.
 "THE COURT: Well, you all put me in a very tough situation.
"WITNESS: I can —
 "THE COURT: I'm not going to make you answer that because I know the answer, and the answer, in my opinion, is they want the Court to do it so if it doesn't turn out all right, the Court did it, we didn't do it. Nobody is going to say that, but that's my opinion, and I'm not asking you to voice yours because you may have some problems up there at Searcy.
"WITNESS: Thank you.
"THE COURT: But now it is my turn.
 "On the petition for writ of habeas corpus, I deny it, and I would say that if Bryce (sic) Hospital can work out a structured environment, if they can work out a structured — well, I guess environment would cover everything, there's nothing wrong with Bryce Hospital doing what they think is right under the circumstances, and in the event that is done and *Page 157 
I — as I have read in a couple of cases up here and there's also a statute on it. If they were arbitrary, capricious in holding this man after all of these steps had been taken, then there would certainly be nothing wrong with coming back to the court, but I deny the habeas corpus." (Emphasis added.) (R. 90-95)
The trial judge's order denying the petition for habeas corpus reads as follows, in pertinent part:
 "(7) The State of Alabama Department of Mental Health and Mental Retardation, in response to Petitioner's request for this Writ of Habeas Corpus, caused a Special Review Committee to meet on November 20, 1985, to consider Petitioner's current mental condition;
 "(8) That said Special Review Committee was composed of four (4) medical experts on the staff of Searcy Hospital who were not on the treatment team of Petitioner and one non-staff psychiatrist, Dr. Claude L. Brown, M.D.;
 "(9) That the said Special Review Committee had available the entire file of the Petitioner as well as ample opportunity to, and did, individually interview the Petitioner;
 "(10) That the Special Review Committee found Petitioner to have a mental illness; that mental illness being paranoid schizophrenia, in remission; that the Petitioner was required to take medication (thorazine) on a daily basis as a part of the treatment for his mental illness; that the Petitioner had achieved the maximum benefits of hospitalization for the treatment of his mental illness; and, unanimously agreed that unless there are assurances of structure in post-hospitalization planning that Petitioner not be released;
 "(11) Expert testimony was presented both by the State of Alabama and by Petitioner to the effect that should Petitioner stop taking his medication there was a likelihood that Petitioner would return to a psychotic state and, therefore, poses a substantial threat of danger to himself or to others;
 "(12) That there is no presently available means to guarantee to this Court or to this community that the petitioner will continue on medication should he be released;
 "(13) That the State of Alabama Department of Mental Health has already released the Petitioner for temporary unsupervised visits within the Community and there have been no incidents that caused concern to the medical staff;
 "(14) That said temporary visits were authorized by the staff of Searcy Hospital without the knowledge of or consent of this Court; and,
 "(15) That the State of Alabama Department of Mental Health presently possess the authority, without consent of this Court, to release the Petitioner when it finds the Petitioner no longer poses a threat of danger to himself or to others;
 "THEREFORE, It is the ORDER of this Court that the Petitioner remain in the custody of the Commissioner of the State of Alabama Department of Mental Health and the Petitioner's request for a Writ of Habeas Corpus be and hereby is DENIED." (R. 20-21) (Emphasis added.)
I
 "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). Therefore, a State must have 'a constitutionally adequate purpose for the confinement.' O'Conner v. Donaldson, 422 U.S. 563, 574, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975)."
Jones v. United States, 463 U.S. 354, 361, 103 S.Ct. 3043,3048, 77 L.Ed.2d 694 (1983).
 "The Due Process Clause 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and *Page 158 
society from his potential dangerousness."
". . .
 "The State may punish a person convicted of a crime even if satisfied that he is unlikely to commit further crimes.
 "Different considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness."
Jones, supra, 463 U.S. at 368, 69, 103 S.Ct. at 3052 (footnote omitted).
Thus, even though an insanity acquittee's commitment was initially permissible, it cannot continue after the basis for his initial commitment no longer exists. O'Conner v. Donaldson,422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975);Benham v. Ledbetter, 785 F.2d 1480, 1486 (11th Cir. 1986). "The committed acquittee is entitled to release when he had recovered his sanity or is no longer dangerous." Jones, supra,363 U.S. at 369, 103 S.Ct. at 3052; Benham, supra, at 1486.
 "[N]o person may be involuntarily confined on grounds of mental illness unless he is found to present a danger to himself or others, see Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1084, 60 L.Ed.2d 323 (1979); Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962), whether or not he stands accused of a crime, Jackson v. Indiana, 406 U.S. 715, 723-30, 92 S.Ct. 1845, 1850-1854, 32 L.Ed.2d 435 (1972), and even then only for so long as he remains dangerous. United States v. Curry, 410 F.2d 1372 (4th Cir. 1969)."
United States v. DeBellis, 649 F.2d 1, 3 (1st Cir. 1981).
 "A find of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom."
O'Conner, supra, 422 U.S. at 575, 95 S.Ct. at 2493.
When an insanity acquittee seeks to be released from custody, his remedy is to petition for a writ of habeas corpus pursuant to § 15-21-3, Code of Alabama 1975. Williams v. Wallis,734 F.2d 1434, 1437 (11th Cir. 1984).
In order to prevail in a habeas corpus proceeding, the insanity acquittee bears the burden of proving, by a preponderance of the evidence, that he is no longer mentally ill or dangerous. Williams, supra, at 1437-38; Knight v. State,460 So.2d 876, 877 (Ala.Cr.App. 1984).
Whether an insanity acquittee is mentally ill at the time he seeks release from confinement is strictly a medical judgment.Powell v. Florida, 579 F.2d 324, 332 (5th Cir. 1978). All of the experts who testified at the appellant's hearing agreed that the appellant is still mentally ill but his illness is in remission. However, as was stated earlier, a finding of mental illness cannot justify a person's continued confinement without a finding of dangerousness. This is "to assure that only those whose potential for doing harm is great enough to justify the deprivation of their liberty are committed." Powell, supra, at 333 (citing Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048,1052, 31 L.Ed.2d 394 (1972).
Whether a person is dangerous "presents a mixed question involving both a legal and social judgment as well as a medical opinion." Powell, supra, at 333. "A finding of dangerousness indicates the likelihood that the person . . . will inflict serious harm on himself or on others." Lynch v. Baxley,386 F. Supp. 378, 391 (U.S.D.C.Ala. 1974), reversed on other grounds,651 F.2d 387 (5th Cir. 1981); Walker v. Dancer, 386 So.2d 475,479 (Ala.Civ.App. 1980).
In Powell, supra, the Fifth Circuit, in a footnote, stated:
 "The basis for commitment of an individual acquitted by reason of insanity is his 'dangerousness' to society. In determining the existence of that dangerousness a court should focus upon the patient's behavior and must predict whether *Page 159 
that behavior demonstrates that the patient, if released, would pose a substantial threat of harm to himself or others. While an initial commitment of an acquitee may well focus upon the crime committed, the release of an individual committed by reason of insanity more properly looks to that individual's behavior since the crime to determine whether or not his recent behavior demonstrates his continuing dangerousness."
Powell, supra, at 333, fn. 10. (Emphasis added.)
In Williams, supra, the Eleventh Circuit Court stated that,
 "whether there is an appropriate place for the acquittee to go and whether the acquittee can be trusted to take his or her medication, are relevant to a determination of continued mental illness or dangerousness. For instance, if an acquittee is no longer dangerous only because he or she is on medication or in a structured environment, then clearly whether he or she will take his or her medication or be in a structured environment after release can and should be considered prior to release."
Williams, supra, at 1437-38.
However, "[a] mere expectancy that danger-productive behavior might be engaged in does not rise to the level of legal significance when the consequence of such an evaluation is involuntary confinement." Lynch, supra, at 391; Walker, supra, 386 So.2d at 479.
The question before this court is whether this appellant, even though he is still mentally ill, is dangerous.
None of the experts at the hearing testified that the appellant is presently dangerous. All of the witnesses believed that the appellant would not suffer a relapse as long as he remained on medication and engaged in out-patient treatment. Each of the appellant's witnesses testified that even if the appellant quit taking medication and stopped his therapy, it would take overwhelming stress to cause the appellant to suffer a relapse, and, even then, the relapse might not necessarily be violent. Even one of the two witnesses for the State testified that the appellant would not likely become psychotic again unless "pressed" "under stress."
It seems clear to this court that the judge's decision in this proceeding was based on the fact that none of the experts could guarantee that the appellant would remain on medication
and would seek treatment as an outpatient.
 "The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient."
Addington v. Texas, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811,60 L.Ed.2d 323 (1979).
 "Commentators and researchers have long acknowledged that even the best attempts to identify dangerous individuals on the basis of specified facts have been inaccurate roughly two-thirds of the time, almost always on the side of over-prediction. On a clinical basis, mental health professionals can diagnose past or present mental condition with some confidence, but strong institutional biases lead them to err when they attempt to determine an individual's dangerousness, especially when the consequence of a finding of dangerousness is that an obviously mentally ill patient will remain within their control."
Jones, supra, 463 U.S. at 378-79, 103 S.Ct. at 3057.
"Given the lack of certainty and the fallibility of psychiatric diagnosis," Addington, supra, 441 U.S. at 429,99 S.Ct. at 1811, it seems impossible that an expert witness could or would ever give a guarantee concerning a mentally ill person. Thus, requiring a guarantee in this particular case imposed *Page 160 
a burden of proof on this appellant which he could not meet.
The appellant in this instant case was only required to prove, by a preponderance of the evidence, that he is no longer dangerous. He is not required to provide guarantees.
Based on the evidence presented at the hearing, we find that the appellant met his burden of proving that he is no longer dangerous. As we stated before, the witnesses testified thatif the appellant quit taking his medication, he might become psychotic again, and if he became psychotic again, he might
become violent if he experienced a great deal of stress.
These facts are too tenuous to sustain a finding of dangerousness. The evidence presented at the hearing does not indicate a likelihood that the appellant will pose a threat to himself or others. The evidence establishes that there is a mere possibility, not even an expectency, that the appellant could become dangerous again, and, then, only under certain circumstances.
It has been said that " 'the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others.' Addington, 441 U.S. at 426, 99 S.Ct. at 1809." Benham, supra at 1486.
 "Hospitals and their medical professionals certainly have no bias against the patient or against release. Therefore, we can safely assume they are disinterested decision-makers. In fact, the mental health system's institutional goal — i.e., transfer to a less restrictive environment and eventual release — favors release. Other factors also favor release, including a perennial lack of space and financial resources, which militates against any motivation to unnecessarily prolong hospitalization, and including the medical professional's pride in his own treatment."
Williams, supra at 1438.
However, in the case at bar, the facts indicate that the hospital staff and the experts who testified for the State were not totally "disinterested decision-makers." The testimony of these witnesses as well as the judge's colloquy with Dr. Kothpandapani makes it clear that the letter from the attorney of the widow of the deceased threatening legal action if the appellant is released, entered into the decision not to release the appellant. We cannot allow the liberty interests of the appellant to be abridged by such threats.
In light of the evidence adduced at the hearing and the fact that the appellant has attained maximum benefits of hospitalization, we conclude that the appellant's continued confinement is in violation of due process of law. Due process demands that the appellant be released into a structured environment.
During the hearing, the appellant presented evidence of the structures he would observe if he were released. The appellant's brother testified that he would offer support and encourage the appellant to take his medication and seek treatment. He stated he would alert someone if he detected signs of relapse in the appellant.
Dr. Herlihy stated he would see the appellant as an out-patient if the appellant was released and he would monitor the appellant's behavior for signs of deterioration. He also testified that he would take regular blood levels of the appellant to make sure he remained on medication.
There was evidence presented that the appellant has a job upon his release. Three of the appellant's witnesses testified that the appellant was an intelligent individual who was willing and wanted to cooperate and was motivated to do so. Furthermore, a letter from the appellant's attorney to the trial court, which is included in the supplemental record, indicates that the appellant is willing to submit to any type of court- or hospital-created structure.
Thus, we must reverse and remand this cause to the trial court with instructions that the appellant be released from the custody of the Alabama Department of Mental Health as soon as a structure plan can be completed as herein set forth.
REVERSED AND REMANDED WITH INSTRUCTIONS. *Page 161 
BOWEN, P.J., and PATTERSON and McMILLAN, JJ., concur.
TAYLOR, J., dissents without opinion.